FILED
2009 Nov-05  AM 11:12
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **CONNIE LANELL MORRIS,** ) | |
| ) | |
| **PLAINTIFF,** ) | |
| ) | |
| **VS.** ) | **2:08-cv-1086-JHH** |
| ) | |
| **BESSEMER CITY BOARD OF** ) | |
| **EDUCATION,** ) | |
| ) | |
| **DEFENDANT.** ) | |

## MEMORANDUM OF DECISION

The court has before it the May 29, 2009 motion (Doc. # 14) of Defendant Bessemer City Board of Education (hereinafter the "Board") for summary judgment against Plaintiff Connie Lanell Morris.  Pursuant to the court's June 1, 2009 order (Doc. #18), the motion was deemed submitted, without oral argument, on June 29, 2009.

## I.    Procedural History

On June 19, 2008, Plaintiff commenced this Title VII and Equal Pay Act ("EPA") action against her employer, the Board, alleging that the Board: (1) discriminated against her because of her gender in both compensation and various other terms and conditions of her employment (Counts I and II); and (2) retaliated

against her for filing an EEOC charge (Count III).  (Doc. # 1).  Defendant's motion

for summary judgment asserts that there are no genuine issues of material fact and

that Defendant is entitled to judgment as a matter of law as to each of Plaintiff's

claims.  (*See* Doc. #14).   For the reasons outlined below, the court finds that

Defendant's motion is due to be granted.

Both parties have filed briefs and submitted evidence in support of their

respective positions.   Defendant submitted evidence[1] (Doc. # 15), a narrative

---

[1] Defendant submitted the following evidence (corresponding with the exhibit number
assigned thereto): (1) Deposition of Plaintiff Connie Morris; (2) Deposition of Dr. Deborah Horn;
(3) Deposition of Principal Jerome Cook; (4) Affidavit of Dr. Deborah Horn; (4(a)) October 2, 2001
Notice of Vacancy for System Athletic Director/ Physical Education position; (4(b)) Carrol Cox's
Employment Contract for Scholastic Year 1973-74; (4(c)) March 12, 2002 Memorandum to Ron
McCall from Wayland Blake re: salary adjustment; (4(d)) November 8, 2001 New Hire Check List
for Pete Wilkins and Personnel report dated November 8, 2001 re: Wilkins' Salary as System
Athletic Director; (4(e)) July 21, 2004 resignation letter to Superintendent Horn from Arthur "Pete"
Wilkins; (5) Resume of Arthur "Pete" Wilkins; (6) Arthur Wilkins' Professional Educator
Certificate; (7) Plaintiff's Professional Certificate for Teachers and Other School Personnel
(1995-2005); (8) Complaint; (9) Documents relating to Plaintiff's EEOC charges of April 20, 2007
and June 2, 2008; (10) Plaintiff's Responses to Defendant's First Requests for Interrogatories and
Production of Documents; (11) Revised Job Qualifications for Systemwide Athletic Director dated
May 21, 2008; (12) Coaching Supplements Chart, approved February 19, 2002; (13) October 1, 2006
letter to Dr. Deborah Horn from Connie Morris re: Plaintiff's Contest to Board's Request for
Repayment; (14) November 20, 2006 letter to Morris from Superintendent Horn regarding the
Board's overpayment to Plaintiff; (15) September 22, 2006 Memorandum to Connie Morris from
Willie Davis Re: Overpayment of Athletic Director's Supplement/Stipend; (16) Responses from
Coaches during a mandatory coaches meeting held August 12, 2004 at Jess Lanier High School re:
Athletic Program; (17) Snapshot View of Hiring History of Connie Morris as System Athletic
Director (summary prepared by Dr. Horn); (18) June 22, 2005 letter to Morris from Birma Wilson,
Director of Human Resources regarding Plaintiff's assignment as Interim Athletic Director and
supplement of $10,000 for 2005-06 school year; (19) July 23, 2004 letter to Morris from Birma
Wilson, Director of Human Resources regarding Plaintiff's appointment as acting Athletic Director
effective August 2, 2004; (20) Bessemer City Schools salary explanation for scholastic year
2004-2005 regarding Plaintiff's $10,000 supplement; (21) Plaintiff's Bessemer City Board of

2

statement of facts (Doc. # 16), and a brief (Doc. # 17) in support of its own motion

for summary judgment on May 29, 2009.  On June 8, 2009, Defendant submitted

Education Supplemental Contract for Scholastic Year 2005-2006 as Interim Athletic Director with $10,000 supplement; (22) May 19, 2005 letter to Morris from Superintendent Deborah Horn regarding Plaintiff's non-renewal as interim Athletic Director and girls head basketball coach; (23) May 18, 2006 letter to Morris from Deborah Horn, Superintendent regarding Plaintiff's non-renewal as Interim Athletic Director and girls head basketball coach; (24) 2005-2006 Sports Program Strengths/Opportunities and Weaknesses/Limitations (summary prepared by Dr. Horn); (25) 2004-2005 Athletic Program Strengths/Opportunities and Weaknesses/Limitations; (26) Salary Calculations for Interim Athletic Director's Supplement re: Overpayment to Plaintiff; (27) MCAI Payroll System Check Records Report 8/1/04 to 9/30/06; (28) May 15, 2007 Memorandum to Dr. Deborah Horn from Warren Craig Pouncey, Assistant State Superintendent for State Department of Education re: Overpayment to Employees; (29) Letter to Connie Morris from Willie Davis, Chief School Financial Officer re: Overpayment to Plaintiff; (30) August 28, 2007 Memorandum to Connie Morris from Dr. Deborah Horn re: overpayment of Interim Athletic Director's Supplement/Stipend; (31) September 18, 2007 Memorandum to Dr. Deborah Horn from Plaintiff Morris re: repayment of $1818; (32) October 2, 2007 Memorandum to Dr. Deborah Horn from Plaintiff Morris re: repayment under protest; (33) May 21, 2004 letter to Morris from Birma Wilson, Director of Human Resources regarding Plaintiff's assignment as girls basketball coach at Jess Lanier High School; (34) Bessemer City Board of Education employee transfer form effective August 2, 2004 regarding Plaintiff's $10,000 supplement; (35) June 24, 2005 letter to Morris from Birma Wilson, Director of Human Resources regarding Plaintiff's assignment as girls head basketball coach with $5,500 supplement for 2005-2006 school year; (36) August 16, 2006 letter to Morris from Birma Wilson, Director of Human Resources regarding Plaintiff's approval of employment for 2006-07 school year as head girls basketball coach; (37) Plaintiff's Bessemer City Board of Education Supplemental Contract for Scholastic Year 2006-2007 as interim head girls basketball coach with $5,500 supplement; (38) April 27, 2007 letter to Morris from Superintendent Horn regarding Plaintiff's non-renewal as head girls basketball coach; (39) May 24, 2007 letter to Morris from Birma Wilson, Director of Human Resources regarding approval of Plaintiff's employment as head girls basketball coach; (40) Plaintiff's Bessemer City Board of Education Supplemental Contract for Scholastic Year 2007-2008 as interim head girls basketball coach with supplement of $5,500; (41) June 18, 2008 letter to Morris from Birma Wilson, Director of Human Resources regarding Plaintiff's employment as head girls basketball coach for 2008-09 season; (42) Plaintiff's Professional Educator Certificate (2005-2010); (43) Bessemer City Schools Personnel Report, July 22, 2004 re: Pete Wilkins' retirement; (44) Bessemer City Schools Personnel Report, June 21, 2005 re: Plaintiff's Supplement in 2005 as Interim Athletic Director; and (45) October 15, 2001 letter to past Superintendent Linda Houghton from Arthur Pete Wilkins regarding application for System Athletic Director/Physical Education position. (Doc. # 15).

3

additional evidence[2] (Docs. # 19, 20) and a supplemental brief (Doc. # 21) in support of its own motion. On June 22, 2009, Plaintiff filed a brief (Doc. # 22) and response to Defendant's narrative statement of facts (Doc. # 23).[3]  On June 29, 2009, Defendant filed a brief in reply to the opposition of Plaintiff (Doc. # 24), a document entitled "Responses in Opposition to Plaintiff's Summary of Undisputed Relevant Material Facts" (Doc. # 25), and a document entitled "Reply to Plaintiff's Response to Defendant's Narrative Statement of Undisputed Facts in Support of Motion for Summary Judgment" (Doc. # 26).

---

[2] Defendant's first supplemental submission contained the following evidence (corresponding with the exhibit number assigned thereto): (46) Affidavit of Birma Wilson, Board's Human Resource Director; (46(A)) Jeffrey Hill's Application for Employment as Assistant Girls' Basketball Coach dated January 6, 2009; (46(B)) Bessemer City Schools Job Posting for Assistant Boys' Basketball Coach, Assistant Girls' Basketball Coaches and Strength Coaches posted on website on November 14, 2008, Vacancy Announcement for Assistant Boys' Basketball Coach, Assistant Girls' Basketball Coaches and Strength Coaches dated November 14, 2008, Advertisement for these positions; (46(C)) Athletic Coach Supplements Proposed September 2008; and (46(D)) Bessemer City Schools Personnel Action Report dated January13, 2009. (Doc. # 19).

Defendant's second supplemental submission included the following evidence (corresponding with the exhibit number assigned thereto): (47) Plaintiff's EEOC Charge, No. 420-2007-02646 filed April 20, 2007 with Narrative Statement; (48) Letter (dated March 5, 2008) to Plaintiff from EEOC District Director confirming the Commission's Receipt of Morris' Request for a Notice of a Right to Sue Re: Charge No. 420-2007-02646; (49) Right to Sue Notice from Department of Justice dated March 19, 2008 Re: Plaintiff's EEOC Charge No. 420-2007-02646; and (50) Plaintiff's EEOC Charge No. 420-2008-02527 filed June 2, 2008. (Doc. # 20).

[3] Plaintiff relied on Defendant's previously-filed evidence without submitting additional evidence.  (Doc. # 22, at 1 n.1).

4

## II.    Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56©, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991) (en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; *i.e.* facts that would entitle it to a directed verdict if not controverted at trial. *See Fitzpatrick*, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

6

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to *affirmatively* show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case. *See Fitzpatrick*, 2 F.3d at 1115-16. If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts. *See Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

Moreover, a plaintiff in a Title VII employment discrimination case maintains the ultimate burden of proving that the adverse employment decision was made because of intentional discrimination. *See Reeves v. Sanderson Plumbing Products,*

*Inc.*, 530 U.S. 133 (2000); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509-12 (1993); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984). Although the Supreme Court previously established the basic allocation of burdens and order of proof in a disparate treatment case, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981), as modified by *Desert Palace v. Costa*, 539 U.S. 90 (2003), that allocation scheme applies only in cases where there is no direct evidence of discrimination, *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir. 1987).[4]

Under the *McDonnell Douglas/Burdine* scheme, a plaintiff first has the burden of proving by a preponderance of evidence a *prima facie* case of discrimination. Once the plaintiff proves a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. Finally, if the defendant carries its burden, the plaintiff must *either* show that the legitimate reasons offered by the defendant are merely a pretext for discrimination *or* that discrimination was a "motivating factor" for the employment action, even though defendant's legitimate reason may also be true or have played

---

[4] Thus, in the absence of direct or statistical evidence of discrimination, neither of which Plaintiff argues here, Plaintiff's claims are evaluated based on circumstantial evidence under the traditional burden-shifting framework. *Wascura v. City of S. Miami*, 257 F.3d 1238, 1242 (11th 2001); *Durley v. APAC, Inc.*, 236 F.3d 651, 657 (11th Cir. 2000).

some role in the decision. *McDonnell Douglas Corp.*, 411 U.S. at 802-05; *Burdine*, 450 U.S. at 252-54; *Desert Palace*, 539 U.S. at 101-02.

## III.   Relevant Undisputed Facts[5]

In 1993, Plaintiff Connie Morris was hired by Defendant as a physical education teacher. (Doc. # 9, Ex. 1, p. 19).  For over sixteen years, Plaintiff has, in addition to her teaching position, served as head girls' basketball coach at Jess Lanier High School, one of the high schools in the Bessemer City School system. (Doc. # 9, Ex. 1, p. 25).  While Plaintiff was serving in those capacities, Jerome Cook became the Principal of Jess Lanier in 2003. (Doc. # 9, Ex. 3, p. 8, 50).

The following year in May 2004, Dr. Deborah Horn began serving as Superintendent of Bessemer City Schools, a capacity she fulfilled during the time period relevant to this case and up until October 2008. (Doc. # 9, Ex. 2, pp. 7-8, 21-22; Ex. 4, p. 1, ¶2).  As Superintendent, Dr. Horn had the authority, subject to Board approval, to recommend personnel for hiring, firing and appointment to permanent and interim positions. (Doc. # 9, Ex. 4, p. 2, ¶2).

In July 2004, a few months after Dr. Horn began serving as Superintendent, Pete Wilkins, the permanent Athletic Director (hereinafter "permanent A.D.") for the

_____

[5] If the facts are in dispute, they are stated in a manner most favorable to the non-movant. *See Fitzpatrick*, 2 F.3d at 1115.

entire Bessemer City Board of Education system, retired. (Doc. # 9, Ex. 4(e); Ex. 43).
According to Dr. Horn, when she learned of Wilkins' intent to retire, she determined
that as a new Superintendent, her time would best be devoted to preparing for the
upcoming year instead of interviewing for a permanent A.D. (Doc. # 9, Ex. 4, pp. 2-3,
¶5). Thus, Dr. Horn decided to appoint an "interim" or "acting" Athletic Director
(hereinafter "interim A.D.")[6] to "continue the program" until a permanent A.D.
position could be posted and filled by a qualified applicant. (Doc. # 9, Ex. 2, p. 46;
Ex. 4, p. 3, ¶5).

### A.    Selection of Plaintiff as Interim A.D.

When considering who would best serve as interim A.D., Horn recalled that
Plaintiff had made a good first impression by demonstrating her commitment to
athletics.  (Doc. # 9, Ex. 4, p. 7, ¶11).  Plaintiff lacked certification or experience as
an administrator, but Horn wanted to give her the opportunity to earn administrative
experience. (Doc. # 9, Ex. 4, p. 7, ¶11).  Accordingly, Dr. Horn selected Plaintiff to
be the interim A.D.  (Doc. # 9, Ex. 2, pp. 45-47; Ex. 4, p. 7, ¶11).

The Board approved Dr. Horn's recommendation, and in August 2004, Plaintiff
was appointed interim A.D. – a position she held until May 2006 pursuant to two

---

[6] According to Plaintiff, "acting" A.D. is the same as "interim" A.D.  (Doc. # 9, Ex. 1, p.
187).

separate contracts.  (Doc. # 9, Ex. 1, pp. 143-44).  While serving as interim A.D., Plaintiff continued to work approximately eight hours per day in her teaching/basketball coach position, which was governed by a separate contract. (Doc. # 9, Ex. 1, p. 25, 246). Typically, Plaintiff would fulfill her teaching duties until 2:00 p.m. and then perform her interim A.D. duties – sometimes until 10:00 or 11:00 p.m. because of games. (Doc. # 9, Ex. 1, p. 246). Plaintiff worked both week days and weekends as the interim A.D.,[7] performing the following duties: attending community meetings, Board meetings, coaching clinics, and workshops; serving as liaison between coaches and the Superintendent for pay issues, equipment issues, parent issues, and incident reports; following up with player injuries by notifying parents, hospitals, and the board; marketing in the community; and working with city officials. (Doc. # 9, Ex. 1, pp. 247-49).

According to Horn, the interim A.D. job was a temporary position that carried fewer powers and duties than the permanent A.D. job. (Doc. # 9, Ex. 2, pp. 66-67; Doc. # 9, Ex. 4, p. 3-5, ¶¶6, 10).[8]   When filling the position, Dr. Horn expected that

---

[7] Plaintiff did not formally log the time she spent on her interim A.D. duties. (Doc. # 9, Ex.1, p. 249).

[8] Although Plaintiff "disputes" this fact (Doc. # 23, at 2, ¶ 36), Plaintiff cites no evidence to support her contention, and the court's independent analysis has revealed no evidence in the record to challenge Dr. Horn's assessment of the difference in the positions.  Moreover, Plaintiff admitted that Wilkins, the permanent A.D. who preceded her, held no teaching responsibilities and performed the A.D. job "full time."  (Doc. # 9, Ex. 1, p. 171).

11

the interim A.D. would oversee the entire athletic program while collaborating and communicating with principals, coaches and students in a positive, productive manner. (Doc. # 9, Ex. 2, pp. 42, 44-45; Ex. 4, p. 3, ¶6).  Dr. Horn also envisioned that the interim A.D. would facilitate a well-run sports program with engaged students, create a new wrestling program (which never materialized), and establish respect with the coaches. (Doc. # 9, Ex. 2, pp. 72, 92; Ex. 3, p. 116; Ex. 4, p. 3, ¶6).

At the same time, however, Dr. Horn knew that Plaintiff, a full-time teacher and coach, had neither the time nor flexibility in her schedule to carry out all of the duties of a permanent A.D. (Doc. # 9, Ex. 4, p. 3, ¶6).  Accordingly, Dr. Horn did not give Plaintiff the responsibility and/or the authority to carry out the following duties, which were expected of the permanent A.D.:

> *Observes coaches sufficiently in order to make future recommendations in terms of job expectancies and to make recommendations to the school principals as to coaches' job assignments.*
>
> *Responsible for evaluating all new candidates for original appointments and [serving as] a member of the selection committee which will recommend a candidate to the Superintendent.*
>
> *Responsible for all recommendations for needed improvement in order to provide adequate facilities.*
>
> *Resolves conflicts that may develop from time to time within the ranks of the athletic department.*
>
> *Seeks and finds ways for supporting and financing the athletic program.*

*Submits a financial report to the Board of Education at each meeting and a summary report at the end of the school year.*

*Receives equipment quotations from authorized coaches, evaluates such requests and approves appropriate order.*

*Maintains a permanent file of players, medical examinations, insurance forms, records, parent consent forms, payments, etc.*

*Maintains permanent records for each sport, such as wins and losses, outstanding records, letterpersons, etc.*

*Maintains a file of all athletic suspensions and expulsions from teams and assures giving each athlete "due process."*

*Works in conjunction with the principals in developing the yearly budget for the athletic program as requested by the head coaches.*

*Provides for the cleaning, repairing and storing of all athletic equipment and maintaining a perpetual inventory of all equipment.*

*Promotes publicity for all interscholastic sports, such as sports brochures, press and radio for all schools and shall assist the booster club in the organization of the game programs.*

*Coordinates with the Director of Facilities and Maintenance the repair and maintenance of varsity athletic field, track, baseball field and gymnasiums, including education facilities.*

*Manages athletic facilities and controls the use of same by band, football team, track squad, etc. Hires or makes necessary arrangements to provide ushers, parking, security, and other services required by athletic operation.*

*Works out a reasonable and equitable program for the utilization of the concession stands.*

13

*Responsible for scheduling physical examinations in accordance with the requirements of the AHSAA.*

*Responsible for the sales of any athletic supplies and jackets to qualified athletes through the athletic office.*

*Responsible for the annual review of the athletic policy and staff handbook.*

(Doc. # 9, Ex. 4, pp. 5-6, ¶10 (emphasis in original); *see also* Ex. 4(a))(enumerating the 38 specific duties of the permanent A.D. position).

## B.    Plaintiff's Compensation as Interim A.D.

For her work as interim A.D., Plaintiff was compensated a supplement pay of $10,000 each year.  (Doc. # 9, Ex. 1, pp. 144, 207-08, 271-72, 332; Ex. 4, p. 8, ¶¶ 8,17; Ex. 18; Ex. 20; Ex. 21; Ex. 26; Ex. 34; Ex. 44).  Wilkins, her permanent A.D. predecessor, was compensated $17,500 per contract year. (Doc. # 9, Ex. 1, pp. 149). According to Superintendent Horn, Plaintiff's interim A.D. supplement was set at $10,000 because Plaintiff lacked experience as either an administrator in general or an A.D. in particular.  (Doc. # 9, Ex. 4, p. 4, ¶8).[9]  Her pay was nevertheless $3,000 more than the allotted supplement amount for any other athletic positions at that time

---

[9] Plaintiff's brief avers - without citation to evidence - that she was never told that her pay level was based upon lack of experience.  (Doc. # 23, at ¶ 14).  It is undisputed that Plaintiff is not certified as an administrator, (Doc. # 9, Ex. 1, p. 13; Ex. 7; Ex. 42), and that, prior to her appointment as interim A.D. in 2004, she had no experience serving as A.D. (Doc. # 9, Ex. 1, p. 170).

14

– the second highest coaching supplement when Plaintiff was chosen as interim A.D. was $7,000 per year. (Doc. # 9, Ex. 12). Dr. Horn also understood that Plaintiff's interim A.D. compensation was greater than the pay for permanent A.D. positions in other school systems, including Fairfield and Midfield City. (Doc. # 9, Ex. 4, p. 4, ¶8).

After the Board voted to approve Superintendent Horn's recommendation, Plaintiff was notified of the decision by letter from the Department of Human Resources of Bessemer City Schools. (Doc. # 9, Ex. 1, p. 292). Plaintiff accepted the position without seeking to negotiate her compensation. (Doc. # 9, Ex. 1, pp. 208-09). While serving as interim A.D., Plaintiff never requested a pay increase from Superintendent Horn, nor did she express dissatisfaction with her supplement amount. (Doc. # 9, Ex. 1, p. 259; Ex. 4, p. 4, ¶8).

### C.    Concerns About Plaintiff's Performance as Interim A.D.

During Plaintiff's first term serving as interim A.D during the 2004-05 school year, concerns arose about her performance in the position. (Doc. # 9, Ex. 2, pp. 47, 50; Ex. 16; Ex. 25). Several coaches told Dr. Horn that Plaintiff lacked cooperation and leadership. (Doc. # 9, Ex. 2, p. 47; Ex. 16; Ex. 25).  Dr. Horn was also made aware of personality conflicts between Plaintiff and other principals/coaches, scheduling problems caused by Plaintiff, and a lack of communication between

Plaintiff and the other coaches. (Doc. # 9, Ex. 2, p. 56).  Several coaches felt that they could not communicate with Plaintiff, and one coach quit because he could not work under Plaintiff's leadership. (Doc. # 9, Ex. 2, p. 48-49; Ex. 3, pp. 117-18).  On one occasion, Dr. Horn was forced to order Plaintiff, as interim Athletic Director, to show respect to a principal and to communicate with him. (Doc. # 9, Ex. 2, p. 130).  On another occasion, Dr. Horn asked Plaintiff and a male coach to transfer to different schools because the discord between them was so severe; they eventually resolved their conflicts and the transfers were unnecessary. (Doc. # 9, Ex. 2, pp. 127-32).

Although Dr. Horn was not satisfied with Plaintiff's initial performance, she nevertheless recommended renewal of Plaintiff's interim A.D. contract for the 2005-06 school year because she wanted to give Plaintiff another chance to prove herself. (Doc. # 9, Ex. 2, pp. 247, 50; Ex. 4, p. 8, ¶17; Ex. 18).  When fellow coaches complained to Dr. Horn about Plaintiff, she asked them to "give her a chance," (Doc. # 9, Ex. 2, p. 47), and repeatedly told them "You know, please work with her. Let's work with her. Lift each other up," (Doc. # 9, Ex. 2, p. 50).

Unfortunately, the complaints about Plaintiff's performance continued into her second term.  (Doc. # 9, Ex. 2, p. 50; *compare* Ex. 24 *with* Ex. 25).[10]   A coaches'

---

[10]  Although Plaintiff again "disputes" this fact, she offers no evidence to support her contention.  (Doc. # 23, at 2, ¶ 49).

survey (which some coaches signed although no signature was required) revealed the following comments from both male and female coaches about Plaintiff's 2005-06 performance as interim A.D: "did not address the needs of the staff and kids," "very poor relationship between coaches and [Plaintiff]," "lack of communication between football staff and [Plaintiff]," "not enough support from [Plaintiff]," and "[Plaintiff] doesn't care about other sports."  (Ex. 24, pp. 2-3; *see also* Doc. # 9, Ex. 2, p. 50-51; 111-12, 121-22).

**D.     The Non-Renewal of Plaintiff as Interim A.D.**

In Dr. Horn's opinion, Plaintiff had failed both to effectuate a smooth transition of the athletic program after Wilkins' retirement, (Doc. # 9, Ex. 4, pp. 8-9, ¶19), and to progress the athletic department in a positive way, (Doc. # 9, Ex. 2, p. 55).  Dr. Horn felt that Plaintiff lacked respect for the coaches with whom she would need to collaborate in order to have a successful athletic program, and she believed that Plaintiff's inability to communicate caused unnecessary administrative headaches. (Doc. # 9, Ex. 2, p. 121; Ex. 4, p. 9, ¶19). Dr. Horn personally observed Plaintiff speak to at least one of her fellow coaches in an unprofessional manner. (Doc. # 9, Ex. 2, p. 130-133; Ex. 4, p. 9, ¶19).

Thus, Dr. Horn's observation of Plaintiff over her two years as interim A.D., combined with the negative feedback received from coaches within the athletic

program, led Dr. Horn to conclude that Plaintiff lacked the administrative skills to continue as interim A.D. (Doc. # 9, Ex. 4, p. 9, ¶20).  Accordingly, she did not recommend Plaintiff again to fill the position, and Plaintiff was non-renewed as interim A.D. on May 16, 2006.  (Doc. # 9, Ex. 4, p. 9, ¶20; Ex. 1, p. 292.).  Instead of finding someone else to fill the interim A.D. position or reinstating the permanent A.D. position for the 2006-07 school year, Dr. Horn gave each school principal the responsibility for maintaining his or her own school's athletic program. (Doc. # 9, Ex. 2, p. 56, 66-67).

### E.   Alleged Overpayment of Compensation and Plaintiff's Grievance

In August or September 2006, Defendant determined that it had inadvertently paid Plaintiff two extra months of compensation - approximately $1800 - during the two years that Plaintiff was serving as interim A.D. (Doc. # 9, Ex. 15; Ex. 26; Ex. 27; Ex. 29; Ex. 30; Ex. 31).   Although Plaintiff was asked to repay the overage, she refused and requested a grievance hearing. (Doc. # 9, Ex. 1 p. 147, 272-79; Ex. 13; Ex. 15; Ex. Ex. 26; Ex. 29; *see also* Ex. 30; Ex. 31; Ex. 32).

A Board grievance hearing was held on March 20, 2007, during which Plaintiff contested the overpayment.  (Doc. # 9, Ex. 1, pp. 146-147).[11]  Eventually, the State

---

[11] Notably, during this hearing, Plaintiff first discovered Wilkins' salary as permanent A.D. (Doc. # 9, Ex. 1, pp. 144-49).  Her first EEOC charge followed shortly thereafter.

18

Department of Education weighed in and instructed the Bessemer Board of Education to seek repayment of the additional compensation from Plaintiff. (Doc. # 9, Ex. 14; Ex. 28). Plaintiff admits that she lacks any evidence to dispute that she was overpaid $1,818.16. (Doc. # 9, Ex. 1, pp. 308-309, 317; Ex. 32).

### F.    The Eventual Hiring of a Permanent A.D.

After the conclusion of one school year allowing each principal to serve as his or her own A.D., Superintendent Horn and the Board decided to reintroduce the permanent A.D position for the following 2007-08 school year, and the position was posted for applicants. (Doc. # 9, Ex. 2, p. 98; Ex. 4, p. 8, ¶18). Superintendent Horn preferred that the next permanent A.D. have previous administrative experience and/or administrative certification. (Doc. # 9, Ex. 4, p. 7, ¶13; *see also* Ex. 11, p. 2). A selection committee was convened and interviews were conducted. (Doc. # 9, Ex. 2, p. 106-08).

In 2007, the committee recommended Keith Mahaffey, Director of the Career Technical Program for the Board. (Doc. # 9, Ex. 2, p. 53-54,106-08; Ex. 4, p. 8, ¶18). Mahaffey possessed extensive knowledge of the athletic program, had coached all sports, and already possessed administrative experience. (Doc. # 9, Ex. 2, pp. 107-108. Ex. 3, p. 121; Ex. 4, p. 8, ¶18). Dr. Horn agreed with the committee's recommendation, and the Board voted to accept Mahaffey as permanent A.D. (Doc.

19

# 9, Ex. 2, p. 53-54,106-08; Ex. 4, p. 8, ¶18). Mahaffey was paid a supplement of $10,000 as the permanent A.D. (Doc. # 9, Ex. 2, pp. 106-107; Ex. 4, p. 8, ¶18).

### G.    Non-Renewal of Plaintiff's Coaching Contracts

The process of hiring a coach involves a recommendation by the Principal to the Superintendent, followed by a recommendation from the Superintendent to the Board. (Doc. # 9, Ex. 3, pp. 52-53). Beginning in 2001, the Board reversed its policy of automatically renewing coaching contracts at the end of each school year. (Doc. # 9, Ex. 1, pp. 27, 174). Instead, the Board began *non*-renewing coaching contracts at the end of the school term, with the option to offer the coaches new contracts during the summer months. (Doc. # 9, Ex. 1, pp. 27, 174; Ex. 17; *see also* Ex. 22, Ex. 23, Ex. 33, Ex. 35, Ex. 36).

In the wake of the new policy, Principal Cook assumed the responsibility of recommending to the Superintendent at the end of each school year whether the Jess Lanier coaches should be renewed or non-renewed. (Doc. # 9, Ex. 3, pp. 35, 44-45). All of the coaches at Jess Lanier have been recommended for non-renewal at some point in time by Principal Cook. (Doc. # 9, Ex. 3, p. 33).

In fact, at the end of 2003, Principal Cook recommended *all* of the coaches, including Plaintiff, for non-renewal. (Doc. # 9, Ex. 3, p. 51). In both 2007 and 2008, Cook again recommended Plaintiff for non-renewal because he wanted the athletic

20

program to move in a different direction. (Doc. # 9, Ex. 3, pp. 54-55). In both years, however, he changed his mind and withdrew his recommendations. (Doc. # 9, Ex. 3, p. 52). Thus, despite having been recommended for non-renewal at the end of several different school years, Plaintiff has always been renewed as the head girls' basketball coach at some point the following summer. (Doc. # 9, Ex. 1, pp. 27-28; *see* Ex. 41). Indeed, at the time of her deposition in February 2009, she was still serving in that position. (Doc. # 9, Ex. 1, p. 25). When Plaintiff was rehired at the start of each of those school years after she initially was non-renewed, her pay was not affected. (Doc. # 9, Ex. 1, p. 177; Ex. 39; Ex. 40).

Principal Cook admitted that he harbors concerns about Plaintiff remaining head coach of the girls' basketball team. (Doc. # 9, Ex. 3, p. 110). On one occasion, Cook learned that Plaintiff's basketball players acted unsportsmanlike by not shaking the other teams' hands after a loss. (Doc. # 9, Ex. 3, pp. 109-10). Cook also was concerned when Plaintiff berated one of her players in public for poor performance and when she had a player removed from the team for purported attitude problems despite the player's strong potential for a scholarship opportunity. (Doc. # 9, Ex. 3, pp. 112-15).

21

H.     **Plaintiff's Formal Complaints**

On April 20, 2007, Plaintiff filed a Charge of Discrimination with the EEOC alleging discrimination on the basis of sex and retaliation. (Doc. # 9, Ex. 9, pp. 1-2; Doc. # 10-2, pp. 1-2).  At Plaintiff's request, the EEOC issued a Notice of Right to Sue letter on March 19, 2008.  (Doc. # 10-2, pp. 3-4). Subsequently, on June 2, 2008, Plaintiff filed a related EEOC charge.  (Doc. # 9, Ex. 9, pp. 7-8).  Seventeen days later, on June 19, 2008, Plaintiff filed this lawsuit alleging violations of Title VII and the EPA. (Doc. # 1).

IV.   **Applicable Substantive Law and Analysis**

Plaintiff has alleged, pursuant to Title VII and the EPA, that Defendant discriminated against her because of her gender, in both compensation and various other terms and conditions of her employment, and then retaliated against her for filing an EEOC charge.  For the reasons outlined below, the court finds that Defendant is due summary judgment on each and every one of Plaintiff's claims.

As an initial matter, however, the court notes that Plaintiff has abandoned all *but* the following claims, which were the only claims addressed in her opposition to Defendant's motion for summary judgment: (1) discriminatory pay in violation of the EPA; (2) discriminatory terms and conditions of employment in violation of Title VII (specifically, difficulty obtaining authorization to purchase new uniforms, denial of

22

access to the weight-training equipment, and not being allowed to miss school to prepare for games or to fulfill her interim A.D. duties); and (3) retaliatory non-renewal of her coaching contract in violation of Title VII and the EPA.  (Doc. # 22).

With the exception of the above-referenced claims, which will be analyzed below, Defendant is due summary judgment on all other claims previously alleged by Plaintiff.  "[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Edmondson v. Board of Trustees of University of Alabama,* 258 Fed.Appx. 250, 253 (11th Cir. 2007)(*citing Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995))("In opposing a motion for summary judgment, a party may not rely on her pleadings to avoid judgment against her. There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments . . . . Here, [plaintiff] did not respond to [defendant's] motion for summary judgment on the Equal P[ay] Act claim. Therefore, she has abandoned it."); *see also Brewer v. Purvis*, 816 F. Supp. 1560, 1579 (M.D. Ga. 1993), *aff'd,* 44 F.3d 1008 (11th Cir. 1995)("Summary Judgment is appropriate since plaintiff failed to respond to [defendant's] argument on this issue.")(citations omitted).

The court separately will address each of the three remaining types of claims.

23

**B.     Title VII "Terms and Conditions" Claims**

Plaintiff contends that Defendant intentionally discriminated against her on the basis of her gender in violation of Title VII by "forc[ing her] to work under terms, conditions and privileges of her employment less beneficial, less desirable, more onerous, and more difficult than similarly situated male counterparts." (Doc. # 1, p. 7).  Title VII of the Civil Rights Act of 1964, as amended, prohibits an employer from discriminating "against any individual with respect to her compensation, terms, conditions, or privileges of employment, because of the individual's race, color, religion, sex or national origin." 42 U.S.C. §2000(e) *et seq.*   However, before a plaintiff may pursue a Title VII discrimination claim, she must exhaust her administrative remedies, beginning with the timely filing of a charge of discrimination with the EEOC, *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1317 (11th Cir.2001)(citing 42 U.S.C. § 2000e-5(b)), and concluding with the issuance of a "notice-of-right" to sue letter prior to the filing of a judicial complaint, *Green v. Union Foundry Co.*, 281 F.3d 1229, 1233-34 (11th Cir.2002)(citing 42 U.S.C. § 2000e-5(f)(1)).   The untimeliness of Plaintiff's Title VII claims on both of these grounds - a tardy charge and a missing notice-of-right to sue letter - are the first two reasons why Defendant is due summary judgment on Plaintiff's Title VII claims.

24

### 1.      Untimeliness of Claims Outlined in April 20, 2007 Charge

For an EEOC charge to be timely within a non-deferral state, such as Alabama, it must be filed within 180 days of the last discriminatory act. 42 U.S.C. § 2000e-5(e)(1); *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002) (stating that "[i]n a State that has an entity with the authority to grant or seek relief with respect to the alleged unlawful practice, an employee who initially files a grievance with that agency must file the charge with the EEOC within 300 days of the employment practice; in all other States, the charge must be filed within 180 days"); *see also Ledbetter v. Goodyear Tire and Rubber Co., Inc.*, 421 F.3d 1169, 1178 (11th Cir.2005), *aff'd*, 550 U.S. 618 (2007) (noting that Alabama is a non-deferral state).

Here, Plaintiff filed her initial EEOC complaint alleging discrimination on the basis of sex and retaliation on April 20, 2007. (Doc. # 9, Ex. 9, pp. 1-2; Doc. # 10-2, pp. 1-2). Plaintiff's opposition to summary judgment "complains of a host of discriminatory behavior by the Defendant" including: (1) Plaintiff's inability to obtain "authorization to purchase new uniforms;"[12] (2) denial of "access to the same weight-training equipment that the male coaches and their teams had;"[13] (3) inability to

---

[12] Plaintiff testified that she had to "go through a lot of red tape" to order equipment or uniforms for the girls' basketball team. (Doc. # 9, Ex. 1, pp. 76-77).

[13] Plaintiff complains that due to the lack of equipment purchased for the use of her team, she had to escort the girls to the YMCA to use the weight equipment. (Doc. # 9, Ex. 1, pp. 91-92).

"prepare during school on game days even though the male coach of the boy's [sic] football team was allowed to do so;" and (4) being "held to a different attendance standard than the male athletic directors."  (Doc. # 22, at 9-10).

In order to be actionable, *each* of these discrete, allegedly discriminatory acts must have occurred within the 180-day period before April 20, 2007, *i.e.,* on or after October 20, 2006.[14]    *See* 42 U.S.C. § 2000e-5(e)(1); *Morgan*, 536 U.S. at 113 ("[D]iscrete discriminatory acts are not actionable if time barred."); *Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1332 (11th Cir. 2000) (finding that failure to file a timely charge with the EEOC results in a bar of the claims contained in the untimely charge).[15]  In other words, any claims based on acts that occurred prior to October 20, 2006, are time barred.   It is not enough for Plaintiff's allegations to be " related to acts alleged in timely filed charges [because e]ach discrete discriminatory act starts

---

[14] One hundred and eighty calendar days before Friday, April 20, 2007 is Sunday, October 22, 2006. However, this date falls on a weekend, so the preceding business day is Friday, October 20, 2006.

[15] Plaintiff has not alleged a hostile environment or ongoing harassment claim in this case; accordingly, all of the acts of which she complains are governed by the 180-day limitation period for discrete allegations of discrimination. *See Morgan*, 536 U.S. at 122 ("We conclude that a Title VII plaintiff raising claims of discrete discriminatory or retaliatory acts must file his charge within the appropriate time period . . . . A charge alleging a hostile work environment claim, however, will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period).  Moreover, Plaintiff has made no argument (and there is no basis) in favor of the application of any equitable relief from the limitations period.  *Morgan*, 536 U.S. at 113.

a new clock for filing charges alleging that act." *Morgan*, 536 U.S. at 113.[16]  Notably,

it is *Plaintiff's* burden to establish that she filed a timely charge of discrimination.

*Jackson v. Seaboard Coast Line R.R. Co.*, 678 F.2d 992, 1010 (11th Cir.1982);

*Jordan v. City of Montgomery*, 283 Fed.Appx. 766, 767 (11th Cir. 2008).

In this case, even viewing the facts in the light most favorable to Plaintiff, she

has not fulfilled that burden of showing timeliness with respect to most - if not all -

of her vague "terms and conditions" claims.  First, Plaintiff's April 2007 EEOC

charge provides no dates for any alleged terms and conditions claims:  "[i]n those 14

years [during Plaintiff's tenure has head basketball coach and teacher at Jess Lanier],

I have been subjected to different terms and conditions of my employment than

similarly situated males."  (Doc. # 9, Ex. 9, pp. 1-2; Doc. # 10-2, pp. 1-2).  Likewise,

Plaintiff's judicial complaint gives little guidance regarding the timeliness of her

claims, contending only "[f]rom May 2005 through May 2008, Plaintiff was held to

different attendance standards as compared to male coaches who frequently called in

sick or were late to work."  (Doc. # 1, at 6, ¶ 13).  Finally, Plaintiff's testimony

provides little more than a sketch timeline of when the alleged events occurred:

---

[16] However, "the statute [does not] bar an employee from using the prior acts as background evidence in support of a timely claim."  *Morgan*, 536 U.S. at 113.

(1)     "I was just allowed to order uniforms this year that I've been
        trying to order for like the last two or three years."  (Doc. # 9,
        Ex. 1, pp. 77-79).

(2)     "[I did n]ot hav[e] the opportunity to purchase adequate weights
        for the program . . . . '07-'08, '06-'07, it's been a few years. " (*Id.*
        at 81).

(3)     "I'm not allowed, like football coaches are, head coach [Jerry
        Dismuke who was head coach in '06-'07], . . . . to miss work . . .
        a day to prepare for my games." (*Id.* at 84, 86).

(4)     "I was held to a different attendance standard" as interim A.D.
        (during the period from August 2004-May 2006) than the male
        athletic directors. (Doc. # 9, Ex. 1, pp. 150-55, 292).

There is simply no evidence establishing that the alleged discriminatory acts occurred

on or after October 20, 2006.

Although the court at the summary judgment stage is charged with resolving

all reasonable doubts and justifiable inferences in favor of Plaintiff, *Fitzpatrick*, 2

F.3d at 1115, it cannot meet Plaintiff's burden for her.  In this case, Plaintiff's burden

of showing that her terms and conditions claims are timely cannot be satisfied by the

mere drawing of an inference or the resolution of a doubt – the evidence simply isn't

there.  For this reason, summary judgment in favor of Defendant is appropriate as to

these claims.

### 2.      Untimeliness of All Claims Alleged in June 2, 2008 Charge

In addition to the requirement that Plaintiff file an EEOC charge within 180 days of each discrete act of alleged discrimination, Title VII also requires that Plaintiff file her judicial complaint within 90 days of exhausting her administrative remedies and receiving her "right-to-sue" letter from the EEOC. *See* 42 U.S.C. § 2000e-5(f)(1); *Green v. Union Foundry Co.*, 281 F.3d 1229, 1233-34 (11th Cir.2002). In this case, Plaintiff has not shown that she has received a right-to-sue letter from the EEOC as to *any of the claims* outlined in her second EEOC charge, which was submitted on June 2, 2008 – just over two weeks before this lawsuit was filed.

Although the 90-day rule is a precondition to suit that is subject to equitable modification, *Forehand v. Fla. State Hosp. at Chattahoochee*, 89 F.3d 1562, 1569-70 (11th Cir.1996), Plaintiff has presented no evidence - documentary or testimonial - that she received her right-to-sue letter, nor has she sought to amend her complaint to allege that she received her right-to-sue letter.  Indeed, her opposition to summary judgment utterly fails to address this argument in any way.  It is Plaintiff's burden to demonstrate that she has exhausted her administrative remedies and/or that an equitable modification should exempt her from any such preconditions. *Jackson*, 678 F.2d at 1010; *Jordan*, 283 Fed.Appx. at 767.

29

For this reason, Plaintiff "has not established that she exhausted these claims," and they are subject to dismissal on summary judgment.  *See Bennett v. Chatham County Sheriff Dept*., 315 Fed.Appx. 152, 161-62 (11th Cir. 2008)(holding that claims "not barred by the 180-day rule" were nevertheless untimely because plaintiff had "not shown that she [] received her right-to-sue letter from the EEOC as to these claims").

### 3.    Failure to Establish a *Prima Facie* Case

Alternatively, even if the court were to assume that Plaintiff's remaining Title VII claims are timely and actionable, summary judgment would nevertheless be appropriate because Plaintiff has failed to establish a *prima facie* case of discrimination.  The disparate treatment *prima facie* case requires a showing that Plaintiff "was a qualified member of a protected class and was subjected to an adverse employment action in contrast with similarly situated employees outside the protected class."  *Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1087 (11th Cir.2004).  Here, Plaintiff's Title VII "terms and conditions" claims fail because they do not rise to the level of an adverse employment action.

Although an adverse employment action need not be an ultimate employment decision, such as termination, failure to hire or demotion, it must meet a "threshold level of substantiality." *Davis v. Town of Lake Park*, 245 F.3d 1232, 1238-39 (11th

30

Cir.2001) (quotation marks omitted).[17]  "[N]ot all conduct by an employer negatively affecting an employee" rises to the required level.  *Davis,* 245 F.3d at 1238. Although evidence of "direct economic consequences" is not always required, "to prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a serious and material change in the terms, conditions, or privileges of employment." *Davis,* 245 F.3d at 1239. In other words, "the employer's action must impact the 'terms, conditions, or privileges' of the plaintiff's job in a real and demonstrable way." *Davis,* 245 F.3d at 1239. The employee's subjective perception of the seriousness of the change in conditions is not controlling; rather this issue is viewed objectively from the perspective of a reasonable person in the circumstances. *Davis,* 245 F.3d at 1239.

Plaintiff's complaints that she had difficulty obtaining authorization to purchase new uniforms, was denied access to the weight-training equipment, was not allowed to miss school to prepare for games, and was not allowed to miss school to

---

[17] Although the Supreme Court adopted a broader view of adverse employment actions in *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 67 (2006), unpublished opinions in the Eleventh Circuit reiterate that the Supreme Court "explicitly limited" that broader interpretation "to claims brought under Title VII's anti-retaliation provision." *Grimsley v. Marshalls of MA, Inc.*, 284 Fed.Appx. 604, 609 n. 5 (11th Cir. 2008) (noting that the Court "was careful to note that a different standard applied to substantive claims of discrimination" when it concluded "'Title VII's substantive provision and its anti-retaliation provision are not coterminous'"); *see also DaCosta v. Birmingham Water Works & Sewer Bd.*, 256 Fed.Appx. 283, 288 n.6 (11th Cir. 2007)(same). Accordingly, this court will "continue to apply the standard articulated in *Davis* to claims of substantive discrimination under Title VII." *Grimsley,* 284 Fed.Appx. at 609 n. 5.

fulfill her interim A.D. duties simply do not rise to the requisite level of substantiality. No direct or indirect economic harm resulted from any of these actions – there is no evidence that Plaintiff's pay, allotted leave balance, or performance record were affected by these alleged incidents. The record also lacks any indication that these actions seriously or materially affected Plaintiff's ability to perform her coaching or teaching duties. Indeed, Plaintiff admits that at some point Principal Cook did order a weight machine and new uniforms for the girls' basketball team. (Doc. # 9, Ex. 1, pp. 88, 90-91).[18]

As to Plaintiff's allegations that she was not allowed to miss school to fulfill her coaching and interim A.D. duties, there is no evidence that Defendant *even made an employment decision*, much less adversely impacted her. Plaintiff admits that she does not remember ever asking Principal Cook for time off to prepare for her games, (Doc. # 9, Ex. 1,  pp. 84-85), and therefore there is no evidence that Defendant refused to treat her as favorably as the male coaches with respect to time off. Plaintiff further concedes that although Principal Cook told her that she could leave campus for basketball team business if she could find someone to "watch her class during her

_____

[18] In any event, the evidence indicates that no team was "owed" the uniforms or equipment it requested – Plaintiff admitted that Principal Cook had discretion not to purchase those items, and she was told that financial reasons prohibited the purchase of all of the equipment she requested. (Doc. # 9, Ex. 1, pp. 83-84).

absence," she never secured anyone to cover her classes.  (Doc. # 9, Ex. 1, pp. 104-06).

Given the level of substantiality required for an action to be "adverse," Plaintiff's *prima facie* case falls short.  None of these trivial harms, petty slights, or minor annoyances are actionable.  *Stephens v. Erickson*, 569 F.3d 779, 790 (7th Cir. 2009)(citing *Burlington Northern*, 548 U.S. at 68-69).  For this alternative reason, Defendant is due summary judgment as to all of Plaintiff's Title VII claims.

## C.    EPA Wage Discrimination Claim

Next, Plaintiff contends that Defendant violated the EPA[19] when by paying her

"a lower rate of compensation" as interim A.D. than the compensation paid to Pete

Wilkins[20] when he served as permanent A.D.  (Doc. # 1, p. 8; Doc. # 9, Ex. 10, p. 11).

It is undisputed that Plaintiff was compensated a supplement pay of $10,000 each

year for her work as interim A.D. (Doc. # 9, Ex. 1, pp. 144, 207-08, 271-72, 332;

Ex. 4, p. 8, ¶¶ 8,17; Ex. 18; Ex. 20; Ex. 21; Ex. 26; Ex. 34; Ex. 44).  Wilkins, her

---

[19] Plaintiff's brief in opposition to summary judgment utterly abandons any *Title VII* disparate treatment claim that she was paid less as interim A.D. based upon her gender. (Doc. # 22, at 3-10). Instead, Plaintiff focuses on her claim for unequal pay under the EPA, rebutting Defendant's EPA-untimeliness arguments while *simultaneously* admitting that her Title VII equal pay claim was filed outside of the 180-day time limit:

> Coach Morris was hired as the Athletic Director by the Defendant in August, 2004. . . . Coach Morris remained in that position until May, 2006 . . . . On April 20, 2007, 31 days after discovering [that Wilkins made $17,500 per year compared to her $10,000 per year], Coach Morris filed her EEOC charge. . . . Coach Morris's EEOC charge was filed more than 180 days after she was no longer Athletic Director.

(Doc. # 22, at 7).  That Plaintiff intended to abandon her Title VII wage claim in sole favor of an EPA-based claim is further underscored by her criticism of Defendant's reliance on a Title VII untimeliness case: "The Defendant's [sic] argues that the *Ledbetter* decision requires the statute to run when the employer first makes the allegedly discriminatory action, but *Ledbetter* was a Title VII case, not decided under EPA."  (Doc. # 22, at 7).

In any event, even if Plaintiff had pursued her Title VII wage claim based upon the compensation paid to her as interim A.D. from August 2004 to May 2006, those claims are untimely because her April 20, 2007 EEOC charge was filed outside of the 180-day time limitation.  *See* discussion *supra* Section IV.B.1.

[20] That Plaintiff has chosen to rely upon Wilkins as her sole wage comparator is not surprising. Although she initially pointed to two other potential comparators – Carroll Cox and Ron McCall – the undisputed evidence reveals that neither of those men was paid more as A.D. than Plaintiff.  (Doc. # 9, Ex. 4, p. 4, ¶9; *see also* Ex. 4(b) and Ex. 4©).

permanent A.D. predecessor, was compensated at the higher rate of $17,500 per contract year. (Doc. # 9, Ex. 1, pp. 149).  Defendant seeks summary judgment on this claim by contending the Plaintiff cannot meet her *prima facie* burden to show that, while serving as interim Athletic Director, she performed "equal work" at a lower wage than Wilkins.[21]

The EPA prohibits employers from paying an employee at a rate less than that paid to employees of the opposite sex for equal work, 29 U.S.C. § 206(d)(1), and it "prescribes a form of strict liability: Once the disparity in pay between substantially similar jobs is demonstrated, the burden shifts to the defendant to prove that a 'factor other than sex' is responsible for the differential.[22] If the defendant fails, the plaintiff wins. The plaintiff is not required to prove discriminatory intent on the part of the defendant." *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1533 (11th

---

[21] Although Defendant originally claimed that Plaintiff's EPA claim was also time-barred (Doc. # 17, at 19), that argument was rescinded on reply, (Doc. # 24, at 4).

[22] The court notes that Defendant's summary judgment EPA arguments do not proceed beyond the *prima facie* case.  In other words, the parties focus solely on whether Plaintiff has demonstrated there exists a "disparity in pay between substantially similar jobs" because Defendant has not alternatively advanced the affirmative defense that "a 'factor other than sex' is responsible for the differential."  *Miranda*, 975 F.2d at 1533.

35

Cir. 1992) (citing *Mitchell v. Jefferson County Bd. of Educ.*, 936 F.2d 539 (11th

Cir.1991)).[23]  When Congress enacted the EPA, its purpose was:

> to remedy what was perceived to be a serious and endemic problem of
> employment discrimination in private industry-the fact that the wage
> structure in many segments of American industry has been based on an
> ancient but outmoded belief that a man, because of his role in society,
> should be paid more than a woman even though his duties are the same.

*Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974) (citations omitted).

A female employee demonstrates a *prima facie* case of an EPA violation by

showing that her employer paid male employees different wages for equal work for

---

[23] More specifically:

> A plaintiff establishes an EPA *prima facie* case 'by showing that the employer paid
> employees of opposite genders different wages for equal work for jobs which require
> equal skill, effort, and responsibility, and which are performed under similar working
> conditions.' [*Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1077-78 (11th
> Cir.2003)](internal quotation marks and citation omitted). If the plaintiff establishes
> a prima facie case, the employer must establish, by a preponderance of the evidence,
> that the difference in pay was due to '(I) a seniority system; (ii) a merit system; (iii)
> a system which measures earnings by quantity or quality of production; or (iv) any
> other factor other than sex.' *Id.* at 1078 (quoting 29 U.S.C. § 206(d)(1)) (alteration
> omitted). If the employer meets its burden, the plaintiff must rebut the defense by
> establishing, through affirmative evidence, that the employer's justification was
> pretext or a post-hoc justification. *Id.* If the employer fails to establish that the pay
> differential was for a reason other than sex, the plaintiff is entitled to judgment, as
> the EPA does not require her to prove that the employer acted with discriminatory
> intent. *Meeks v. Computer Assoc. Int'l*, 15 F.3d 1013, 1019 (11th Cir.1994).

*Lawver v. Hillcrest Hospice, Inc.*, 300 Fed.Appx. 768, 772, 2008 WL 5007189, 3 (11th Cir. 2008).
Nevertheless, even absent a requirement of proof of discriminatory intent, "[t]he EPA's broad
defense for employers ensures that the Act targets only intentional purposeful discrimination."
*Adams v. Florida Power Corp.*, 255 F.3d 1322, 1329 (11th Cir. 2001)(Barkett, J., specially
concurring).

jobs which require "'equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *Irby v. Bittick*, 44 F.3d 949, 954 (11th Cir.1995) (quoting *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974) and 29 U.S.C. § 206(d)(1)). Although formal job titles or descriptions may be considered, the controlling factor in the court's assessment of whether two jobs are substantially equal must be actual job content. *Miranda*, 975 F.2d at 1533; *Arrington v. Cobb Cty.*, 139 F.3d 865, 876 (11th Cir. 1998) ("[A]lthough formal job titles or descriptions may be considered, the controlling factor in the court's assessment of whether two jobs are substantially equal must be actual job content."); *Hodgson v. Brookhaven Gen'l Hosp.*, 436 F.2d 719, 724 (5th Cir. 1970) ("Job descriptions prepared by the employer may or may not fairly describe job content.").[24] Thus, "[t]he *prima facie* case . . . focuses solely on the *primary duties* of each job, not duties that are incidental or insubstantial." *Miranda*, 975 F.2d at 1533 (emphasis added).

A plaintiff need only demonstrate that the jobs at issue are *substantially* similar, not identical. *Miranda*, 975 F.2d at 1533. Nonetheless, "[t]he standard for determining whether jobs are equal in terms of skill, effort, and responsibility is high." *Waters v. Turner, Wood, & Smith Ins. Agency, Inc.*, 874 F.2d 797, 799 (11th

---

[24] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Cir.1989).  Indeed, Plaintiff's EPA burden of proving that her position was equivalent to the positions of her comparators is a more difficult burden than the comparison which must be made to support their Title VII claims.  *Miranda*, 975 F.2d at 1526.[25]

Against that backdrop, the court has given careful consideration to each prong of the tripartite test of skill, effort, and responsibility which "constitute separate tests, *each of which must be met* in order for the equal pay standard to apply." 29 C.F.R. § 1620.14 (1986) (emphasis added).[26]

### a.    Equal Effort

"Effort is concerned with the measurement of the physical or mental exertion needed for performance of a job. Job factors which cause mental fatigue and stress, as well as those which alleviate fatigue, are to be considered." 29 C.F.R. § 1620.16(a) (1986).  As noted earlier, the court's analysis must focus not on the incidental or

------

[25] The former Fifth Circuit noted that when Congress drafted the EPA, it substituted "equal" for "comparable" to indicate that "the jobs involved must be virtually identical, that is, they would be very much alike or closely related to each other." *Brennan v. City Stores, Inc.*, 479 F.2d 235, 238 (5th Cir.1973).  More recently, the Eleventh Circuit echoed that observation:  "Congress manifested its intent to narrow the applicability of the Act . . . . [and] intended to permit employers wide discretion in evaluating work for pay purposes. Thus, although employees do not have to prove jobs are identical, they have the heavy burden of proving 'substantial identity of job functions.'" *Waters*, 874 F.2d at 799.

[26] The court is aware that Plaintiff must also establish "similar working conditions" to meet her *prima facie* burden, but Plaintiff incorrectly argues that "similar working conditions" relates to the number of schools for which she and Wilkins were responsible.  (Doc. # 22, at 5).  The Supreme Court has interpreted "similar working conditions" to relate only to surroundings or hazards of the job.  29 C.F.R. § 1620.18; *Corning Glass Works*, 417 U.S. at 201-02.  Because those are not in dispute here, the court does not analyze the "similar working conditions" component.

insubstantial duties of a job, but on the "primary duties"– a term of art that is sprinkled throughout the EPA jurisprudence of this Circuit[27] but not as of yet clearly defined.  It is apparent from the case law that "primary" most certainly refers to the significance of a duty when viewed as a component of overall job content - primary duties cannot be incidental, nonessential, or unimportant. *See, e.g., Miranda*, 975 F.2d at 1533.

Less clear in the "primary" analysis, however, is what importance should be placed on the *amount of time* devoted to a duty.  Although the effort required of two jobs *may* be deemed unequal if one job demands the performance of an additional duty that takes up a substantial amount of time,[28] the case law suggests that time alone is not the determinative factor of what duties are "primary" to job content.  As the

_____

[27] In fact, one of the more recent EPA opinions issued by the Eleventh Circuit (which was not selected for publication) emphasizes that a court must first determine if a duty is "primary" before that duty can be considered in the substantially similar analysis:

> Moreover, the parties raise genuine issues of fact as to whether field maintenance and generation of revenue were primary duties of the baseball coach. Such a distinction is material because, to the extent that they were not primary duties, it was improper for the district court to consider them in determining whether the two coaching positions were substantially similar.

*Hankinson v. Thomas County School System,* 2007 WL 4226389, *2 (11th Cir. December 3, 2007).

[28] *See Brookhaven Gen'l Hospital,* 436 F.2d at 725 ("[J]obs do not entail equal effort, even though they entail most of the same routine duties, if the more highly paid job involves additional tasks which (1) require extra effort, (2) consume a significant amount of the time of all those whose pay differentials are to be justified in terms of them, and (3) are of an economic value commensurate with the pay differential.").

39

former Fifth Circuit observed, "a wage differential can be justified for employees who are available to perform an important differentiating task even though they do not spend large amounts of time at the task." *Marshall v. Dallas Independent School District*, 605 F.2d 191, 195 (5th Cir.1979); *Hodgson v. Golden Isles Convalescent Homes, Inc.*, 468 F.2d 1256, 1258 (5th Cir.1972); *see also Mulhall v. Advance Sec., Inc.,* 19 F.3d 586, 593 (11th Cir. 1994)(finding that even in the absence of evidence "of the time actually spent" in the investigative function of the purported comparator's job, the skills related to that function are "more than an incidental part"of his job as a whole, rendering the jobs incomparable); *Beall v. Curtis*, 603 F.Supp. 1563 (M.D.Ga.), *aff'd without op.*, 778 F.2d 791 (11th Cir.1985) (applying the "important differentiating factor" analysis to the "equal skill" prong of the *prima facie* case).  In reaching the conclusion that the amount of time devoted to a duty may not signify its importance to overall job content, the former Fifth Circuit relied on the legislative history of the statute:

> It is not merely comparable skill and responsibility that Congress sought to address, but a substantial identity of job functions . . . . Congress intended to permit employers wide discretion in evaluating work for pay purposes. In the House Subcommittee Report on the Equal Pay Act, 109 Cong.Rec. 9209-9210 (1963), examples were debated to illustrate that a wage differential can be justified for employees who are available to perform an important differentiating task even though they do not spend large amounts of time at the task. Again, this approach requires

examination of equal work claims in the light of practice in the
particular employment.

*Hodgson*, 468 F.2d at 1258.   The interpretive regulations echo that sentiment. *See*
29 C.F.R. § 1620.14 ("[T]he amounts of time which employees spend in the
performance of different duties are not the sole criteria. It is also necessary to
consider the degree of difference in terms of skill, effort, and responsibility. These
factors are related in such a manner that a general standard to determine equality of
jobs cannot be set up solely on the basis of a percentage of time.").

In this case, the undisputed facts indicate that Plaintiff, while serving as interim
A.D., performed substantially less work than Wilkins when he served as permanent
A.D.  Unlike Plaintiff, Wilkins served only as the A.D., with no simultaneous duties
to teach or coach. (Doc. # 9, Ex. 4, p. 2, ¶4; Ex. 1 p. 171). As such, Wilkins was able
to devote his full attention, time, experience, and knowledge to the position. Although
Wilkins was coded as a "part-time" employee, the evidence indicates that he actually
worked full-time in the position.  (Doc. # 9, Ex. 1, p. 171; Ex. 4, p. 2, ¶4).

On the other hand, Plaintiff, while serving as interim A.D., continued to work
approximately eight hours per day in her teaching/basketball coach position, and then
she performed her A.D. duties in the time remaining. (Doc. # 9, Ex. 1, p. 25, 246).
Dr. Horn knew that Plaintiff, a full-time teacher and coach, could not devote enough

41

time and would not have flexibility in her teaching schedule to carry out all of the duties of a permanent A.D. (Doc. # 9, Ex. 4, p. 3, ¶6).   Thus, when filling the position, Dr. Horn testified that her expectations of Plaintiff were different from what she would have expected of a permanent A.D. (Doc. # 9, Ex. 2, pp. 42, 44-45; Ex. 4, p. 3, ¶6).

Specifically, Dr. Horn expected that Plaintiff would oversee the entire athletic program while collaborating and communicating with principals, coaches and students in a positive, productive manner.  (Doc. # 9, Ex. 2, pp. 42, 44-45; Ex. 4, p. 3, ¶6).  She also envisioned that Plaintiff would facilitate a well-run sports program with engaged students, create a new wrestling program (which never materialized), and establish respect with the coaches. (Doc. # 9, Ex. 2, pp. 72, 92; Ex. 3, p. 116; Ex. 4, p. 3, ¶6).  Plaintiff's own description of her duties is commensurate with Dr. Horn's vision for the position.  Plaintiff testified that her duties included:  attending community meetings, Board meetings, coaching clinics, and workshops; serving as liaison between coaches and the Superintendent for pay issues, equipment issues, parent issues, and incident reports; following up with player injuries by notifying parents, hospitals, and the board; marketing in the community; and working with city officials. (Doc. # 9, Ex. 1, pp. 247-49).

That Dr. Horn expected less of Plaintiff than she would have of a permanent A.D. is also consistent with the duties assigned to Wilkins when he held the position. The evidence indicates that Wilkins was charged with the performance of approximately 38 specific duties.  (Doc. # 9, Ex. 4, pp. 5-6, ¶10 (emphasis in original); *see also* Ex. 4(a))(enumerating the 38 specific duties of the permanent A.D. position).[29]

Aside from Wilkins' enumerated duties, the evidence indicates that he performed additional duties outside the office environment that further differentiate the content of his position from that of Plaintiff's.  Wilkins carried out essential tasks that were not officially required of him, including mowing the grass, tending to the football fields, and conducting general maintenance of athletic facilities and equipment for the school system. (Doc. # 9, Ex. 4, p. 2, ¶4; *see also* Ex. 4(a)).

As a final note, the court recognizes that the labeling of Plaintiff's position as "interim" is *not* dispositive of the effort required of her – despite Defendant's repeated focus on this title.  Job titles are not the lynchpin of the equality analysis. At the same time, however, there is no evidence to suggest that the "interim" moniker

---

[29] When it comes to "equal effort," the duties listed by the permanent A.D. job description may or may not have been carried out by Wilkins in daily practice.  However, even in the absence of evidence "of the time actually spent" in a particular job function, those duties – especially given the sheer number and content thereof - can still constitute "more than an incidental part" of job content.  *Mulhall*, 19 F.3d at 593.

43

was a "post-event justification," as Plaintiff contends.  (Doc. # 22, at 6).   The evidence shows that long before Plaintiff filed this lawsuit, Plaintiff's position was referred to as "interim" or "acting." (Doc. # 9, Exs. 14, 17, 18, 19, 21, 22, 23, 26, 30).

No matter what the official title, however, it is clear from the record that Plaintiff's position was - from the very beginning - intended to be a temporary arrangement in the wake of the Board's hiring of a new Superintendent who was prioritizing her initial tasks.  When Wilkins retired as A.D. a few months after Dr. Horn was hired, she determined that her time would best be devoted to preparing for the upcoming year instead of interviewing for a permanent A.D. (Doc. # 9, Ex. 4, pp. 2-3, ¶5; Ex. 4(e); Ex. 43).  Thus, Dr. Horn decided to appoint an interim A.D. to "continue the program" until a permanent A.D. position could be advertised, posted, and filled by a qualified applicant. (Doc. # 9, Ex. 2, p. 46; Ex. 4, p. 3, ¶5).[30]  Dr. Horn's testimony is uncontroverted that she hired Plaintiff rather quickly to ensure a smooth transition of the Athletic Department while giving her time to transition into her new Superintendent responsibilities.  (Doc. # 9, Ex. 4, p. 3, ¶6).  All of the evidence supports Defendant's contention that Plaintiff's position was intended to - and indeed did - require less effort than the position occupied by Wilkins before her.

_____

[30] That the position differed substantively from the permanent A.D. position is also indicated by Dr. Horn's selection of Plaintiff without posting the position, convening a hiring committee, or conducting interviews. (*See, e.g.,* Doc. # 9, Ex. 2, p. 106-08).

Accordingly, the court concludes that Plaintiff has not established the "equal effort" prong of her *prima facie* case. Because each prong of the tripartite test must be established to fulfill the *prima facie* burden, for this reason alone Defendant is entitled to judgment as a matter of law on Plaintiff's EPA claim. In the alternative, however, the court has determined that Plaintiff fails to meet the other *prima facie* requirements.

### b.    Equal Skill

The former Fifth Circuit, drawing upon the regulations published by the Secretary of Labor, found that "[s]kill includes consideration of such factors as experience, training, education, and ability." *Pearce v. Wichita County*, 590 F.2d 128, 133 (5th Cir.1979) (citing 29 C.F.R. § 800.125 (1977)).[31] Nonetheless, "[p]ossession of a skill not needed to meet the requirements of the job cannot be considered." 29 C.F.R. § 1620.15 (1986). Indeed, "at this stage *the jobs* and not the employees are compared, [and thus] only the skills and qualifications actually needed to perform the jobs are considered." *Miranda*, 975 F.2d at 1533 (emphasis added).

A distinction should be made between (on the one hand) *standard* experience, training, or education required for a position and possessed by all individuals in that

---

[31] The court noted that, although those regulations are not binding, they should be given great weight. *Pearce*, 590 F.2d at 133 n. 7. The more recent replication of the regulations cited by the court in *Pearce* can be found at 29 C.F.R. § 1620.15(a) (1986).

45

position, and (on the other hand) any *additional or unique* experience, training, or education not required for a position but that an individual may bring to the table. The Eleventh Circuit has made clear that consideration of the latter category of skills - those unique qualifications possessed by a particular employee holding a job - is proper only at the affirmative defense stage to "operate as a defense to liability rather than as part of a plaintiff's *prima facie* case under the Act." *Miranda*, 975 F.2d at 1533 n.18; *see also Mulhall,*19 F.3d at 594 n.18 (finding that "individual employee qualifications are relevant only to defendant's affirmative defenses"). Therefore, if a particular individual's experience, training, or education is not relevant to the *prima facie* case, it logically follows that the only experience, training, or education that could be relevant to the *prima facie* case is that which may be properly characterized as a job requirement, prerequisite, or qualification applied to any person in that position. Such a distinction is consistent with the Eleventh Circuit's *prima facie* focus on a comparison of the *jobs* and not the individuals who hold those jobs.[32]

---

[32] Indeed, in the absence of such a distinction, the former Fifth Circuit's inclusion of "education, training, and experience" as components of the "equal skill" analysis would be meaningless as those characteristics would not be relevant until after the *prima facie* analysis is complete. The court is aware that the Eleventh Circuit has not made this distinction in so many words. Nonetheless, in analyzing the "equal skill" requirement, recent case law in this Circuit has left open the possibility that an employer-mandated "job requirement" of education, training, or experience may be used to differentiate two positions in the EPA *prima facie* analysis. In *Mulhall*, although the court found it irrelevant to the *prima facie* equal skill analysis that the comparator had an accounting degree and the plaintiff did not, the court made clear that "Defendants deny that an accounting degree is a job requirement." *Mulhall,* 19 F.3d at 594. In *Miranda*, although the court

Here, the Board's preference that an A.D. have previous administrative experience and/or certification, (Doc. # 9, Ex. 4, p. 7, ¶13; *see also* Ex. 11, p. 2), appears to be more than just a unique skill possessed by the Plaintiff's selected comparator. Indeed, the evidence suggests that such a qualification was *standard* for employees who occupied the permanent A.D. position; both Plaintiff's predecessor and her successor possessed that experience while Plaintiff did not. Wilkins had not only a Master's degree in Health and Physical Education and administrative certification, (Doc. # 9, Ex. 1, p. 168; Ex. 5; Ex. 6), but also 25 years of experience as an A.D. prior to being hired as the Board's permanent A.D, (Doc. # 9, Ex. 1, p. 168; Ex. 5; Ex. 45). Mahaffey, who followed Plaintiff as A.D. after a year hiatus, possessed extensive knowledge of the athletic program, had coached all sports, and already possessed administrative experience. (Doc. # 9, Ex. 2, pp. 107-108. Ex. 3, p.

---

found that the comparator's prior experience as a manager was irrelevant, there was no evidence that managerial experience was a prerequisite for the buyer position that plaintiff and her comparator both held. *Miranda*, 975 F.2d at 1533. Neither of those cases forecloses the conclusion that a skill required of all individuals who hold a position may distinguish two positions in the EPA *prima facie* analysis. At least one other district court in this Circuit has concluded that a skill such as education may be considered as part of the EPA *prima facie* case in the context of college professors where "degrees and education are intrinsic to the qualifications of university professors." *Schultz v. Board of Trustees of University of West Florida*, 2007 WL 2066183, *19 (N.D.Fla. 2007) (finding that Plaintiff and her comparators held different degrees and thus did not possess "equal skill" and distinguishing *Mulhall* because the accounting degree found to be irrelevant in *Mulhall* was not required for the position).

47

121; Ex. 4, p. 8, ¶18).  That Plaintiff lacked both certification and administrative experience is not in dispute. (Doc. # 9, Ex. 2, pp. 45-47; Ex. 4, p. 7, ¶11).[33]

At the very least, the importance placed by the Board on administrative skills renders that qualification "more than an incidental part" of the permanent A.D. position – regardless of the time other A.D.s *actually* spent in an administrative role. As the Eleventh Circuit noted in *Mulhall*:

> We cannot so easily dismiss the investigative component of Hill's job. While there is no evidence before us of the time actually spent in this particular job function, investigative skills no doubt play some role in one's ability to direct investigations, making investigative knowledge more than an incidental part of Hill's position. Plaintiff does not assert that she possessed any investigative skills. Accordingly, we agree with the district court that under the strict similarity requirement imposed in EPA cases, the plaintiff failed to establish a prima facie case as it relates to the Group 2 comparator, William Hill.

*Mulhall*, 19 F.3d at 593.  Just as with the "important differentiating factor" case law outlined above in the analysis of "equal effort," this Circuit made clear in *Mulhall*

---

[33] According to Defendant, Plaintiff was paid only $10,000 *because of* her lack of experience as either an administrator in general or an A.D. in particular.  (Doc. # 9, Ex. 4, p. 4, ¶8). It is not insignificant that during the time of Plaintiff's interim appointment, her supplement pay was $3,000 *more* than any other athletic supplement awarded to a Board employee. (Doc. # 9, Ex. 12).  Her interim pay was also more than the compensation provided to permanent A.D.s in other school systems.  (Doc. # 9, Ex. 4, p. 4, ¶8).

that the amount of time (or lack thereof) that an employee actually utilizes a skill is

not necessarily indicative of that skill's importance to the job.[34]

Thus, the court alternatively concludes that the skill of administrative

experience/certification "is more than an incidental part" of the permanent A.D.

---

[34] This concept is bolstered by the persuasive Eleventh Circuit affirmance of another district court's application of the "important differentiating factor" analysis to the "equal skill" prong of the *prima facie* case. *See Beall v. Curtis*, 603 F.Supp. 1563 (M.D.Ga.), *aff'd without op.*, 778 F.2d 791 (11th Cir.1985). In *Beall*, the district court concluded that the six female nurse practitioner plaintiffs who were employed at the University of Georgia Health Service failed to satisfy their EPA *prima facie* burden because the skill required of their positions was not comparable to that of a physician's assistant (Curran) who "possesse[d] skills, by virtue of his experience, training, education, and ability, that plaintiffs have not acquired." *Beall*, 603 F.Supp. at 1578. The court observed,

> Numerous witnesses testified about the training, skills used, and available skills of plaintiffs and of Mr. Curran. There is no doubt that the physicians, registered nurses, physician's assistants, and nurse practitioners who work at the University of Georgia Health Service usually provide identical or substantially similar health care services to patients. The overlap of categories of health care providers does not, however, make irrelevant the different levels of medical competence, skill, and expertise, or the different responsibilities, of persons in different categories. No one would argue that a physician and a nurse who routinely handle identical problems and provide identical treatment perform an identical job; a physician is expected to demonstrate greater expertise that makes him or her more valuable in the unusual case.

*Beall*, 603 F.Supp. at 1570-71. Although the nurse practitioner plaintiffs suggested that any extra skills possessed by the physician's assistant were a "'superfluous, expensive redundancy,'" and they urged the court to "compare skills actually required and used on the job rather than skills that create merely hypothetical differences in job performance," the court rejected plaintiffs' attempt to equate the minimal time devoted to using those skills with their importance to the overall job content. *Beall*, 603 F.Supp. at 1578. Relying on the "important differentiating factor" case law from the former Fifth Circuit, the court observed that "even if Mr. Curran's skills are seldom used, whether that is because patients needing those skills rarely appear at the Health Service, or consult physicians there instead, or are immediately referred to an outside hospital, they are relevant to distinguish his work from that of plaintiffs." *Beall*, 603 F.Supp. at 1578. Although the Eleventh Circuit affirmed that reasoning without opinion, it also cited with approval to the *Beall prima facie* case analysis in *Waters v. Turner, Wood & Smith Ins. Agency, Inc.* 874 F.2d 797, 800 (11th Cir. 1989).

49

position, distinguishing it from Plaintiff's interim position under the "strict similarity" requirement.  *Mulhall*, 19 F.3d at 593.  Plaintiff's failure to satisfy the "equal skill" prong of the test, just as with the "equal effort" prong, is independently fatal to her EPA claim.

Finally, and again alternatively, Plaintiff's claim fails because she cannot satisfy the final stage of the EPA *prima facie* analysis.

### c.      Equal Responsibility

The undisputed evidence indicates that Plaintiff's level of responsibility differed greatly from Wilkins.  "Responsibility is concerned with the degree of accountability required in the performance of the job, with emphasis on the importance of the job obligation." 29 C.F.R. § 1620.17(a).  In this case, the undisputed evidence indicates that Wilkins - unlike Plaintiff - was given the responsibility of "[o]bserv[ing] coaches sufficiently in order to make future recommendations in terms of job expectancies and to make recommendations to the school principals as to coaches' job assignments" and "evaluating all new candidates for original appointments and [serving as] a member of the selection committee which will recommend a candidate to the Superintendent."  (Doc. # 9, Ex. 4, pp. 5-6, ¶10 (emphasis omitted); *see also* Ex. 4(a))(enumerating the 38 specific duties of the permanent A.D. position).

The Eleventh Circuit has made clear that "[s]upervising more employees . . . requires greater skill, effort, and responsibility." *Slattery v. Precision Response Corp.,* 167 Fed.Appx. 139, 143 (11th Cir. 2006) (citing *Irby*, 44 F.3d at 954; *Waters*, 874 F.2d at 799-800).  For this independent reason, the permanent and interim positions are not comparable in responsibility or accountability for EPA purposes.

For all three of the independent reasons outlined above, Plaintiff has failed to satisfy her *prima facie* EPA burden in this case and Defendant is due summary judgment on that claim.

### D.   EPA and Title VII Retaliation Claims

Plaintiff's final claim is that Defendant retaliated against her after she filed her April 2007 EEOC charge when Principal Cook recommended, in May 2008, non-renewal of her contract as head girls' basketball coach. (Doc. # 9, Ex. 1, pp. 44-47; Doc. # 1, at 9; Doc. # 9, Ex. 9, pp. 1-2).[35]

---

[35] Plaintiff's brief in opposition to summary judgment also alleges - for the first time - that Defendant retaliated against her by: (1) "not hiring an assistant coach after he coached all season;" and (2) "making [Plaintiff's] assistant coaches split an assistant coach pay supplement during the 2008-09 school year." (*Compare* Doc. # 1, at 5-6 *and* Doc. # 22, at 12).  The court need not consider the merits of these allegations, because Plaintiff offers no analysis in support thereof.  Rather, she baldly asserts that "such activity was serious enough to have discouraged a reasonable worker from making complaints." (Doc. # 22, at 12).  In any event, those allegations are new claims improperly raised for the first time in opposition to summary judgment.  *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir.2004) (per curiam) ("At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed.R.Civ.P. 15(a). A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.").

In any event, those decisions do not rise to the level of adverse employment actions against

Both Title VII and the EPA protect persons against retaliation for asserting their rights under those statutes. *See* 42 U.S.C. § 2000e-3(a)(Title VII); 29 U.S.C. § 215(a)(3)(EPA); *see also EEOC v. White and Son Enterprises*, 881 F.2d 1006, 1010-12 (11th Cir.1989)(holding that § 215(a)(3) creates EPA retaliation cause of action). The *prima facie* retaliation case requires a demonstration by Plaintiff of the following: "(1) she engaged in activity protected under [the] act; (2) she subsequently suffered adverse action by the employer; and (3) a causal connection existed between the employee's activity and the adverse action." *Wolf v. Coca-Cola Co.,* 200 F.3d 1337, 1342-43 (11th Cir. 2000).[36] As previously discussed, once a *prima facie* case is established, the burden shifts to the defendant to rebut the presumption of retaliation by producing legitimate reasons for the adverse employment action. *Springer v. Convergys Customer Management Group Inc.*, 509 F.3d 1344, 1347 (11th

---

Plaintiff. Although Jeffrey Hill assisted Plaintiff with her team prior to his application for the assistant coach position, he did so without Board approval. (Doc. # 1, Ex. 46(A)-(D)). When Hill did apply for the official position, which was posted at the time, his application was submitted over one month after the application deadline. (Doc. # 1, Ex. 46(A)-(D)). Accordingly, he was not hired. With respect to Plaintiff's complaint that her assistant coaches were asked to split their supplement pay, the evidence indicates that all coaches were subject to that rule. In September 2008, the Board began requiring split supplements for *any head coach employing more than one assistant*. (Doc. # 1, Ex. 46(C)-(D)).

[36] Plaintiff must satisfy those same elements regardless of whether her claim lies with the EPA or Title VII. *Compare Wolf,* 200 F.3d at 1342-43 *with Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 507 (11th Cir.2000)("[A] plaintiff must show that (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) there is a causal connection between the two events.").

Cir. 2007). If the defendant offers legitimate reasons, the presumption of retaliation disappears, and the plaintiff must demonstrate that the employer's reasons are a "pretext for prohibited retaliatory conduct." *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 507 n.6 (11th Cir.2000).

In this case, the court assumes, without deciding, that Plaintiff has established a *prima facie* case of retaliation as to the non-renewal of her coaching contract in May 2008. However, the court finds that summary judgment is due to be granted as to this claim because Plaintiff has not "demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Defendant's] proffered legitimate reasons for its action that a reasonable factfinder could find [those reasons] unworthy of credence." *Silvera v. Orange County School Bd.*, 244 F.3d 1253, 1258 (11th Cir.2001) (citation omitted).

Defendant explains that Plaintiff's coaching contract was non-renewed at the end of the 2007-08 school year as a normal procedure, not in retaliation for any complaints she had made. (Doc. # 9, Ex. 1, pp. 176-177; Ex. 38). The process of hiring a coach involves a recommendation by the Principal to the Superintendent, followed by a recommendation from the Superintendent to the Board of Education. (Doc. # 9, Ex. 3, pp. 52-53). Plaintiff admits that beginning in 2001, the Board reversed its policy of automatically renewing coaching contracts and replaced it with

53

a policy of initial non-renewal with the option to offer a coaching contract during the summer.  (Doc. # 9, Ex. 1, pp. 27, 174; Ex. 17; *see also* Ex. 22, Ex. 23, Ex. 33, Ex. 35, Ex. 36).  The undisputed evidence indicates that after the change in Board policy in 2001, Principal Cook began routinely recommending non-renewal of coaching contracts. (Doc. # 9, Ex. 3, pp. 35, 44-45).  Indeed, all of the coaches at the school have been recommended by Cook for non-renewal at some point in time. (Doc. # 9, Ex. 3, p. 33).

Even prior to the filing of her EEOC charge and judicial complaint, Principal Cook recommended Plaintiff for non-renewal.  In fact, at the end of 2003, Cook recommended *all* of the coaches, including Plaintiff, for non-renewal. (Doc. # 9, Ex. 3, p. 51). Cook also explained that he again recommended Plaintiff for non-renewal in both 2007 and 2008 because he wanted the athletic program to move in a different direction. (Doc. # 9, Ex. 3, pp. 54-55).  In both years, however, he changed his mind and withdrew his recommendations. (Doc. # 9, Ex. 3, p. 52).  Indeed, the undisputed evidence shows that no matter what the initial decision regarding Plaintiff's contract, she has - eventually - always been renewed as the head girls'

basketball coach, including for the 2007-08 and 2008-09 seasons.  (Doc. # 9, Ex. 1, pp. 27-28; *see* Ex. 41).[37]

Principal Cook explained, however, that he had good reasons for not recommending Plaintiff for renewal in recent years – none of which Plaintiff has sought to rebut.  Cook admitted that he harbors concerns about Plaintiff remaining head coach of the girls' basketball team because of the way in which she coaches her team.  (Doc. # 9, Ex. 3, p. 110).  For example, on one occasion, Cook learned the girls' basketball players acted unsportsmanlike by not shaking the other teams' hands after a loss. (Doc. # 9, Ex. 3, pp. 109-10).  Cook also was concerned when Plaintiff berated one of her players in public for poor performance and when she had a player removed from the team for purported attitude problems despite the player's strong potential for a scholarship opportunity. (Doc. # 9, Ex. 3, pp. 112-15).  Cook's concerns about Plaintiff's performance are uncontroverted and undercut Plaintiff's pretext argument.

Defendant's legitimate, non-retaliatory reasons for recommending non-renewal of Plaintiff's coaching contract after the filing of her EEOC charge remain

---

[37] At the time of Plaintiff's deposition in February 2009, she was still serving in that position. (Doc. # 9, Ex. 1, p. 25).  Because the decision was always made to rehire Plaintiff before the start of each school year, her pay was never affected by the initial non-renewal recommendations. (Doc. # 9, Ex. 1, p. 177; Ex. 39; Ex. 40).

unchallenged by Plaintiff, much less shown to be a cover-up for retaliation.  There is no reason for the court to conclude that Plaintiff was treated any differently than any other coach at Jess Lanier, and no evidence that would lead a reasonable factfinder to find Defendant's reasons "unworthy of credence." *Silvera*, 244 F.3d at1258. Accordingly, summary judgment in favor of Defendant is due on Plaintiff's retaliation claims.

## V.  Conclusion

For all of the reasons outlined above, the court finds that Defendant has carried its burden on summary judgment of demonstrating that there are no material facts in dispute and that it is entitled to judgment as a matter of law on all of Plaintiff's claims.  A separate order will be entered.

**DONE** this the ___5th___ day of November, 2009.

_____

SENIOR UNITED STATES DISTRICT JUDGE